AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Samsung Galaxy Note5 Cellular Phone
FCC ID: A3LSMN920P

) Case No.
)
)
)
)

FILED

AUG 27 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

'19 MJ 3632

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated herein by reference

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 & 846 | Possession with intent to Distribute a Controlled Substance; Conspiracy to commit same |

The application is based on these facts:
See attached Affidavit, incorporated herein by reference

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Robert Chavez, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/26/19

City and state: San Diego, California

_____
Judge's signature

Hon. Bernard Skomal, United States Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>Samsung Galaxy Note5 Cellular Phone<br>FCC ID: A3LSMN920P | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT** |

I, Robert Chavez, a Special Agent with the United States Drug Enforcement Administration, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. This affidavit supports an application for warrant to search the following electronic device (collectively the **Target Device**):

> Samsung Galaxy Note5 cellular telephone
> FCC ID: A3LSMN920P
> (**Target Device**) as more particularly described in Attachment A;

2. The **Target Device** was seized from Abraham GONZALEZ-Espinoza's person incident to his arrest for violation of Title 21, U.S.C. § 841 (a)(1), Possession with intent to Distribute Heroin, at the Campo, California Border Patrol checkpoint on August 9, 2019. The **Target Device** is currently in the possession of the Drug Enforcement Administration, 2255 Niels Bohr Ct, San Diego, California 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crime, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review

1

of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times and amounts are approximate.

## EXPERIENCE AND TRAINING

5. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA) charged with enforcing United States Code (U.S.C) Title 21, of the Controlled Substance Act. I am empowered and required by law to conduct investigations and make arrest under 21 U.S.C. § 878.

6. I am currently assigned to the High Intensity Drug Trafficking Area (HIDTA) unit, Group 71, at the San Ysidro Regional Office (SYRO). I have been employed with the DEA since September 2018. My duties include the investigation and apprehension of individuals involved in narcotic related activities. I have received formal training at the DEA Training Academy located in Quantico, Virginia. My training included the identification of many types of controlled substances by sight and odor, including methamphetamine.

7. Prior to working for the DEA I served as a United States Border Patrol Agent for approximately 8 years. As a Border Patrol Agent I was responsible for investigating illegal immigration and narcotics trafficking into the United States. During my time in the Border Patrol I have received formal training in the identification of trafficking techniques used by traffickers of humans and narcotics. Prior to working for the United States Border Patrol I served in the United States Marine Corps with Marine Corps Security Forces Battalion (MCSF BN). I hold a bachelor's degree in Business Management and a master's degree in Business from the University of Southern California (USC).

8. During the course of my duties as a DEA Special Agent I have participated in undercover investigations involving the purchase of controlled substances, executed

2

search warrants for controlled substances, and have conducted numerous surveillances in connection with these investigations. I have spoken with drug dealers, drug users, and confidential sources about current drug trends, methods of drug sales and use of drugs. I am familiar with the operation of illegal drug trafficking organizations in the United States, including those organizations whose operations involve the distribution of wholesale quantities of cocaine, methamphetamine, heroin and money laundering.

9. Based on my training and experience, including consultations with other law enforcement personnel, I know that drug traffickers commonly use electronic Device such as cellular telephones to store names, telephone numbers, records, drug ledgers, and other information pertaining to drug trafficking activity. I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating drug conspiracies that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import controlled substances from Mexico into the United States;

    b. tending to identify other facilities, storage Device, or services—such as email addresses, IP addresses, phone numbers—that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

    d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

     e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

     f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

10. Based upon my training and experience, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs; use cellular telephones, emails, and text messages to facilitate drug activity. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of multiple vehicles as conveyances for drugs and drug proceeds, and the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds.

11. I also know from training and experience that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication Device (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

12. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers and portable radios to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of methamphetamine. Typically, couriers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to and following the crossing of

4

the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Drug smugglers and their organizations use cellular and digital telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular and digital telephones.

13. Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a drug smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

## FACTS SUPPORTING PROBABLE CAUSE

14. On August 9, 2019, Border Patrol Agent (BPA) Rafael Fregoso, BPA Edward Ferreira, and BPA Ralph Salcido were assigned to the Campo Border Patrol Station Interstate 8 (I-8) Westbound Immigration Checkpoint near Pine Valley, California. The checkpoint was fully operational with all lights, signs and cones in place. All agents were in full rough duty uniform with agency badges and insignia clearly visible.

15. BPA Fregoso together with his service canine are trained and certified in the detection of concealed humans, and the odors of marijuana and its derivatives, methamphetamines and its derivatives, cocaine and its derivatives, heroin and its derivatives, and ecstasy.

16. At approximately 12:09 PM, a dark blue Cadillac sedan bearing California license plate 8LFN405 approached the primary inspection area where BPA Ferreira was conducting primary inspection duties. BPA Ferreira noticed that the driver, who later identified himself as Abraham GONZALEZ-Espinoza, was holding the steering wheel with a firm grip and had both of his arms extended sitting in an uncomfortable position. BPA Ferreira also noticed that GONZALEZ-Espinoza did not make eye contact and his voice was quiet and shaky when responding to questions. BPA Ferreira referred the vehicle

5

to secondary for further inspection.

17. At the secondary inspection area, BPA Salcido began to question GONZALEZ-Espinoza as to his intended destination. GONZALEZ-Espinoza stated that he was going to visit his aunt at an unknown location in San Diego, CA. GONZALEZ-Espinoza also stated that he was coming from Mexicali and had just crossed the Calexico port of entry. BPA Fregoso overheard BPA Salcido talking to GONZALEZ-Espinoza and noticed that GONZALEZ-Espinoza's voice was shaky and appeared nervous. BPA Fregoso then asked GONZALEZ-Espinoza if he would allow a canine to conduct a sniff of his vehicle and if agents could search the vehicle. GONZALEZ-Espinoza stated that he would allow agents to conduct a canine sniff and search the vehicle.

18. Agent Fregoso, with his service canine, proceeded to conduct a canine sniff of the vehicle. As the service canine was walking around the vehicle he began to put his nose up in the air and began to frantically sniff the driver's side front bumper area. As BPA Fregoso continued to walk around the vehicle he noticed that his service canine would approach the front bumper area and would start to frantically inhale attempting to trace the odors that he was trained to detect to the source.

19. Agent Fregoso notified the secondary agents that his canine had alerted to the vehicle. BPA Fregoso asked GONZALEZ-Espinoza if the agents could take his vehicle to the inspection lift to conduct a 7 point inspection and GONZALEZ-Espinoza consented. BPA Fregoso entered the vehicle and attempted to start the vehicle. The vehicle failed to start. BPA Fregoso asked GONZALEZ-Espinoza if he had any battery issues. GONZALEZ-Espinoza stated he would occasionally need to jump start the vehicle. BPA Fregoso opened the hood of the vehicle and began to inspect the battery. BPA Fregoso immediately noticed that the battery did not fit in the battery compartment area as it was too large. BPA Fregoso also noticed that the battery connectors had recent tool markings.

20. Agents proceeded to push the vehicle out of secondary to finish conducting the 7 point inspection. BPA Fregoso continued to inspect the battery of the vehicle. BPA Fregoso disconnected the battery to remove it from the vehicle. When BPA Fregoso lifted

the battery out of the compartment he noticed that the battery was extremely light. After a closer inspection BPA Fregoso noticed that the top of the battery was glued on. After removing the top section of the battery, BPA Fregoso discovered four vacuumed sealed bundles. The content of the packages was a black gluey substance consistent with the characteristics of black tar heroin.

21. The substance was tested by BPA Fregoso and witnessed by BPA Ferreira. One package tested positive for the properties and characteristics of heroin. The bundles were determined to be heroin with a total weight of 3.92 kilograms.

22. At approximately 2:50 PM GONZALEZ-Espinoza was informed that he was under arrest for Title 21 U.S.C. § 841(a)(1) Manufacturing, Distributing or Disbursing of Any Controlled Substance.

23. At approximately 5:31 PM, DEA Special Agent (SA) Robert Chavez read GONZALEZ-Espinoza his Miranda Rights in the English language via form DEA-13, as witnessed by DEA SA Juan Hernandez. GONZALEZ-Espinoza invoked his right to remain silent and refused to answer questions without the presence of a lawyer. The interview was terminated at approximately 5:33 PM

24. Based upon my experience and investigation in this case, I believe that the GONZALEZ-Espinoza, as well as other persons, were involved in an ongoing conspiracy to distribute heroin, as well as the actual distribution of heroin or some other federally controlled substance. Based on my experience investigating drug traffickers, I also believe that the GONZALEZ-Espinoza may have used the **Target Device** to coordinate with co-conspirators regarding the distribution of heroin, or some other federally controlled substance.

25. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the drug trafficking activities of GONZALEZ-Espinoza, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos, and other digital information are stored in the

memory of the **Target Device**.

26. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in transporting their valuable cargo to its destination within the United States. Given this, I request permission to search the **Target Device** for items listed in Attachment B beginning on April 1, 2019, up to and including August 9, 2019. That date range is based on: (1) GONZALEZ-Espinoza's alleged California Vehicle registration, states it was issued on May 9, 2019, and GONZALEZ-Espinoza would have been in communication with co-conspirators in advance thereof; (2) GONZALEZ-Espinoza first crossed the vehicle on April 30, 2019; and (3) GONZALEZ-Espinoza stated a friend from Mexico gave him the vehicle in early April.

## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile Device today can be simple cellular telephones and text message Device, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may

be acquired forensically, not all of the data subject to seizure may be so acquired. For Device that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

//

//

//

//

//

//

//

//

//

//

//

## CONCLUSION

30. Based on all of the facts and circumstances described above, there is probable cause to conclude that GONZALEZ-Espinoza used the **Target Device** to facilitate violations of Title 21, U.S.C. § 841(a)(1).

31. Because the **Target Device** were promptly seized during the investigation of GONZALEZ-Espinoza trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by GONZALEZ-Espinoza continues to exist on the **Target Device**.

32. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the item described in Attachment A and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Robert Chavez
DEA Special Agent

Subscribed and sworn to before me this  26  day of August, 2019.

HON. BERNARD G. SKOMAL
United States Magistrate Judge

10

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 21, U.S.C. § 841 (a)(1), Possession with intent to Distribute Heroin, Title 21, U.S.C. § 846, Conspiracy to Distribute Controlled Substance is:

>Samsung Galaxy Note5 Cellular Telephone
>FCC ID: A3LSMN920P
>**(Target Device)**;



The **Target Device** is currently in the possession of the Drug Enforcement Administration, 2255 Niels Bohr Ct, San Diego, California 92514.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 1, 2019 through August 9, 2019:

a. tending to indicate efforts to import controlled substances from Mexico into the United States;

b. tending to identify other facilities, storage Device, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject phone; or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

which are evidence of violations of Title 21, U.S.C. § 841 (a)(1).